JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiffs-appellants Cleveland Bluffs Development, LLC and Cleveland Assets, LLC appeal from a summary judgment entered in favor of defendants-appellees A.J. Hai Sons, Osprey California, LLC, The Penrose Corporation, and Real Assets Management Company.[1] The primary issue on appeal is whether the court erred by finding that appellees demonstrated the absence of any genuine issue of material fact by showing that they did not act fraudulently by failing to disclose an amendment to a lease between Cleveland Assets (a company formerly owned by Hai-Penrose) and the General Services Administration ("GS A") on property owned by Cleveland Bluffs. We conclude that the court did not err by granting summary judgment because Cleveland Bluffs failed as a matter of law to establish the requisite elements of fraud.
 {¶ 2} We view all disputed facts most strongly in favor of Cleveland Bluffs, the nonmoving party. See Civ. R. 56(C). 1476 Davenport Limited Partnership, a company owned by James Kassouf, owned a parcel of land in downtown Cleveland. The GSA held an option to purchase the land for $11.4 million. In September 1999, the GSA solicited offers from developers to design, build, and maintain a new Cleveland field office for the Federal Bureau of Investigation ("FBI"). The "solicitation of offer" specified that the GSA would assign the purchase option on the land to the successful developer whom, the GSA assumed, *Page 5 
would purchase the land by exercising the option. The solicitation of offer specified the amount of rent that the FBI would pay for the building.
 {¶ 3} Although described as an "experienced real estate businessman," Kassouf learned that Anthony Hai and Christopher Penrose, the principals in Hai-Penrose, had expertise in building and managing FBI buildings. Having been told that a bid to develop the project would be more attractive to the GSA if he teamed up with them, Kassouf arranged to meet with Hai and Penrose in October 1999.
 {¶ 4} When the parties met, Hai voiced concerns about Kassouf s involvement in the project because Kassouf was facing federal tax charges at the time.[2] Kassouf assured Hai-Penrose that both the GSA and the FBI knew about the pending charges and that they were no impediment to his participation in the project.
 {¶ 5} Pending verification of Kassouf s status with the GSA, the parties began exploring how they would structure a deal. Hai-Penrose flatly rejected a co-development deal with Kassouf. Hai-Penrose also had concerns that the high cost of the land as represented by the GSA's option presented a major obstacle to completing the project under the rent cap established by the GSA. The parties then began discussing the feasibility of a ground lease[3] in which Hai-Penrose would build the new building, manage it, and pay *Page 6 
Kassouf simple rent on the land. They anticipated that the ground lease would expire upon the completion of the building, at which time Hai-Penrose would sell the building and the option on the land back to Kassouf. Hai-Penrose would continue to manage the building and Kassouf would collect the rent from the FBI.
 {¶ 6} The idea of a ground lease was attractive to both parties. By entering into a ground lease, the $11.4 million option to purchase the land was removed from the bid equation, thus allowing Hai-Penrose to make a much lower bid than if they had to exercise the option. Kassouf would ultimately retain ownership of the land and all rents while Hai-Penrose earned a management fee.
 {¶ 7} Hai-Penrose confirmed Kassouf s ability to participate in the FBI building project with a representative from the GSA. In February 2000, the parties entered into a letter of intent that formalized their initial discussions relating to the formation of a ground lease. The letter of intent provided that one of Hai-Penrose's companies would obtain a construction loan by using the land owned by 1476 Davenport Limited as collateral. Hai-Penrose would then oversee construction of the building. Upon the issuance of a certificate of occupancy and the FBI's commencement of rent payments to Hai-Penrose, Hai-Penrose would begin paying ground rent to Kassouf. Finally, Hai-Penrose would, as soon as reasonably practicable after the issuance of a certificate of occupancy, obtain permanent *Page 7 
financing in an amount sufficient for Kassouf to pay off the construction loan and buy out Hai-Penrose's interest in the project for $3.5 million.
 {¶ 8} The GSA awarded the lease to Penrose Corporation in April 2000. Penrose Corporation in turn assigned its interest in the lease to a newly-formed affiliate of Hai-Penrose called Cleveland Assets, LLC. 1476 Davenport Limited transferred its interest in the land to a newly-formed corporation called Cleveland Bluffs. Cleveland Assets became the borrower on a construction loan from KeyBank, and used the assets of Cleveland Bluffs (the land itself) as collateral for the loan.
 {¶ 9} Following the GSA's award of the lease, the parties began negotiating the terms of the ground lease. These negotiations were complicated by a dispute that arose concerning the possible terms of a KeyBank construction loan. KeyBank issued a commitment letter on the proposed construction loan which contained provisions precluding Cleveland Assets from using rent payments from the GSA to pay ground rent to Cleveland Bluffs. The letter also stated that KeyBank would not provide a second, six-month extension on the construction loan unless KeyBank approved of Cleveland Assets' "exit strategy which cannot involve Ground Lessor [Cleveland Bluffs] or any affiliate, principal or related party of the same."[4] Kassouf objected to these terms because they would essentially bar him from purchasing Cleveland Assets upon completion of construction. *Page 8 
 {¶ 10} Hai-Penrose agreed in principle that KeyBank's terms regarding an "exit strategy" that essentially barred Kassouf and his interests from owning the building would be inconsistent with what the parties contemplated in the letter of intent.[5] However, they believed that the entire project would collapse if the parties did not settle the terms of the ground lease, so they asked Kassouf to withdraw his objections to the loan commitment letter and sign the ground lease. The parties reached an impasse over this point. In July 2000, Hai-Penrose filed suit in federal court to force Kassouf to sign a ground lease and capitulate to the terms of the construction loan as outlined in the KeyBank commitment letter.
 {¶ 11} Publicity from the federal lawsuit caused the GSA to become aware for the first time that Hai-Penrose had planned to enter into a ground lease with Kassouf. When the GSA contracting officer learned of the lawsuit, she called Hai-Penrose and expressed her agitation. Hai-Penrose told the contracting officer that they were meeting with Kassouf and hoped to finalize the land closing. *Page 9 
 {¶ 12} About four weeks later, on August 24, 2000, the GSA sent Hai-Penrose a supplemental lease amendment, known in this litigation as "SLA-2," which stated that Cleveland Assets had no right to make any transfer of ownership or control of the premises after final completion without the GSA's prior written approval. As relevant here, that approval required the completion of GSA Form 527 "Contractors Qualifications and Financial Information." SLA-2 noted that it would take "approximately 6 weeks to process" Form 527. The lease amendment forwarded by the GSA contained a copy of Form 527.
 {¶ 13} Hai-Penrose signed SLA-2 in September 2000, although the exact date is unclear. It did not disclose the existence of SLA-2 to Cleveland Bluffs at the time; however, it did tell Cleveland Bluffs that in another provision of the same lease amendment, the GSA had exercised an option to authorize more funding for additional square footage in the building. Hai-Penrose told Cleveland Bluffs that any information contained in their lease with the GSA was on a "need to know" basis.
 {¶ 14} The lawsuit forced the parties into a settlement posture. Hai-Penrose persuaded KeyBank to delete from its commitment letter any language that would bar Kassouf s participation in the loan. The amended commitment letter, dated August 2000, stated that KeyBank would grant a second, six-month extension on the construction loan if, in its sole discretion, it approved of Cleveland Assets' "proposed exit strategy to pay off all indebtedness to Lender." With the construction loan terms settled, the parties executed the ground lease on September 15, 2000. The terms of the ground lease were substantially similar to those set forth in the letter of intent: Cleveland Assets would obtain a construction *Page 10 
loan by pledging the assets of Cleveland Bluffs; it would complete construction of the building; upon the issuance of a certificate of occupancy and the FBI's commencement of rent to Cleveland Assets, Cleveland Assets would begin paying ground rent to Cleveland Bluffs; Cleveland Assets would obtain permanent financing for Cleveland Bluffs; and Cleveland Bluffs could either (1) purchase the GSA lease or (2) purchase Cleveland Assets' interest in the lease by paying an agreed-upon price for the interests of Hai-Penrose.
 {¶ 15} The ground lease also permitted Cleveland Assets to receive the excess cash flow from the time rents were first received from the GSA until the permanent financing closed.[6] During his deposition, Kassouf agreed that he understood that if there was a delay between the time the building was completed and the time the loan closed on the permanent financing, the GSA rents would go to Cleveland Assets and that Cleveland Assets would only pay rent on the ground lease.
 {¶ 16} Construction commenced on the FBI building and was completed in January 2002. Hai-Penrose said that on January 8, 2002, they informed Kassouf that in order for him to "close the transaction," Kassouf needed to complete some paperwork, including Form 527. Cleveland Bluffs did not dispute that Hai-Penrose forwarded to Kassouf a copy of Form 527 in March 2002. It did, however, claim that it did not learn about SLA-2 and the GSA's right of approval over the transfer of the lease until May 2002. *Page 11 
 {¶ 17} Regardless of the actual timing of when Kassouf learned about SLA-2, Kassouf had significant doubts as to whether the GSA would approve of him being the owner of the building. Security measures within the federal government had been significantly increased after the terrorist attacks of September 11, 2001, and Kassouf had, by that time, taken up residence in Lebanon. Moreover, during negotiations for the ground lease, Kassouf had filed a lawsuit against the FBI under the Freedom of Information Act.
 {¶ 18} Although Hai-Penrose did not have the same level of concern as Kassouf about the GSA's approval of the transfer of Cleveland Assets, they offered Kassouf an alternative.[7] Hai-Penrose proposed that the parties delay transferring Cleveland Assets for two years in order to "season" the building. They would then give Kassouf a minority interest in Cleveland Assets and grant him special distributions and adjust the ground rent. Structured in this manner, Hai-Penrose believed that Kassouf would obtain substantially all of the benefits of complete ownership of Cleveland Assets without risking the Form 527 approval process.
 {¶ 19} Hai-Penrose's suggestion did not come to fruition, and in June 2002, Cleveland Bluffs filed suit in federal court against them, alleging that Hai-Penrose breached the ground lease by entering into SLA-2. It made no allegations that Hai-Penrose engaged in any kind of *Page 12 
fraud by failing to disclose the existence of SLA-2. Cleveland Bluffs later dismissed that action in January 2003.
 {¶ 20} Kassouf did not submit Form 527 until September 2002. Although SLA-2 noted that the approval process could take up to six weeks, the GSA did not approve the change of ownership until March 2004. Regional counsel attributed the delay to the late submission of certain financial documents required by SLA-2 and Cleveland Bluffs' untimely submission of formally executed guarantees. Evidence offered by Cleveland Bluffs tended to show that the GSA's delay in processing Form 527 may have been caused by the GSA's aversion to Kassouf taking over the lease. Although not entirely fleshed out by the record, there is evidence that the GSA instituted debarment proceedings against Kassouf in November 2002.[8]
Those proceedings were obviously terminated given the GSA's subsequent approval of Cleveland Bluffs' acquisition of Cleveland Assets.
 {¶ 21} Cleveland Bluffs made no allegations that Hai-Penrose caused any of this delay. The evidence showed that Hai-Penrose wrote the GSA in December 2002 to ask that Cleveland Bluffs' Form 527 be processed "as soon as practicable," even though the federal lawsuit was still pending at the time. The evidence showed that Kassouf caused some of the delay by sending Form 527 to the wrong GSA office. The GSA did not inform Kassouf *Page 13 
about the error for eight months, at which time it requested additional information from him. Despite the GSA's approval of the Cleveland Assets purchase, Cleveland Bluffs could not obtain financing to transfer the equity of Cleveland Assets to Cleveland Bluffs until May 2005. The parties closed the transfer of Cleveland Assets in July 2005.
 {¶ 22} In its complaint, Cleveland Bluffs alleged that Hai-Penrose fraudulently withheld the existence of SLA-2, and that SLA-2 was material to its ground lease with Hai-Penrose because it significantly restricted Cleveland Assets' ability to transfer its equity assets to Cleveland Bluffs. Cleveland Bluffs further alleged that it spent nearly two years trying to obtain GSA approval for the proposed acquisition and more than one year trying to find and finalize financing for the acquisition of Cleveland Assets. During that time, Hai-Penrose retained the right to receive rent under the GSA that Cleveland Bluffs claims it would have been entitled to had the acquisition of Cleveland Assets been consummated as outlined in the ground lease. Its claims for relief asserted fraud, conspiracy to commit fraud, breach of contract, misappropriation and conversion, and unjust enrichment.
 {¶ 23} Hai-Penrose sought summary judgment on grounds that there was no evidence to show that it committed a fraud by failing to timely disclose to Cleveland Bluffs the existence of the lease amendment. They maintained that no duty or obligation to disclose the lease amendment arose under either the terms of the ground lease or because of a fiduciary relationship.
 {¶ 24} Cleveland Bluffs maintained that summary judgment was inappropriate because there were questions of fact relating to Hai-Penrose's decision to withhold and *Page 14 
conceal the existence of SLA-2. It argued that the GSA's approval process delayed the consummation of the Cleveland Assets acquisition to its detriment, and that Hai-Penrose took advantage of the delay to its financial benefit.
 {¶ 25} The court granted summary judgment without opinion.
 I {¶ 26} The first assignment of error is that the court erred by granting summary judgment on the fraud claim. Cleveland Bluffs argues that it presented evidence which, when viewed in a light most favorable to it, would allow reasonable minds to differ on whether it established all of the elements of fraud.
 {¶ 27} The tort of fraud consists of six elements: (1) a representation of a fact, (2) which is material, (3) made falsely — either with knowledge of its falsity or utter disregard and recklessness as to falsity — (4) with an intent to mislead, (5) with justifiable reliance thereupon, and (6) a resulting injury. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 632;Burr v. Stark Cty. Bd. of Commrs. (1986), 23 Ohio St.3d 69, paragraph two of the syllabus.
 {¶ 28} Fraud may consist not only of an affirmative misrepresentation or concealment, but of nondisclosure when there is a duty under the circumstances to disclose. In State v. Warner (1990), 55 Ohio St.3d 31,40, the supreme court quoted Chiarella v. United States (1980),445 U.S. 222, 228, for the proposition that:
 {¶ 29} "`One who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose *Page 15 
arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' (Footnote omitted.)"
 {¶ 30} The use of the word "duty" in these circumstances suggests one of two possible relationships. First, there is a formal fiduciary relationship "`in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'"Groob v. KeyBank, 108 Ohio St.3d 348, 2006-Ohio-1189, at ¶ 16, citingIn re Termination of Emp. of Pratt (1974), 40 Ohio St.2d 107, 115. These relationships may arise, for example, in attorney/client, guardian/ward, doctor/patient, and principal/agent relationships.
 {¶ 31} Cleveland Bluffs concedes that it had no "formal fiduciary relationship" with Hai-Penrose. See Plaintiffs' Response Opposing Defendants Hai-Penrose's Motion For Summary Judgment at 34. The record supports this concession because each party was very experienced in real estate development, they were represented by skilled counsel, they negotiated the terms of the ground lease in their own best interests, and the agreement embodied all of the rights and obligations of the parties. Clearly, this was an arm's length transaction to which no formal fiduciary duty attached. See Blon v. Bank One, Akron, N.A.
(1988), 35 Ohio St.3d 98, 101 ("Ordinarily in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other."). *Page 16 
 {¶ 32} There are informal fiduciary relationships in which the court may determine whether the circumstances surrounding the interaction between the parties support the imposition of a heightened duty. Even in an arm's length transaction in which no formal fiduciary duty exists, a duty to speak may arise "out of an informal relationship whereboth parties to a transaction understand that a special trust or confidence has been reposed." Id. (Emphasis added); Stone v. Davis
(1981), 66 Ohio St.2d 74, 78 ("A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed."); Ligman v. Realty One Corp., Summit App. No. 23051,2006-Ohio-5061, at ¶ 9 ("An informal relationship, however, cannot be unilateral, and occurs only where `both parties understand that a special trust or confidence has been reposed.'"). (Internal citations omitted.)
 {¶ 33} The informal fiduciary relationship law developed by the supreme court may be said to be predicated on an entrustment of discretion:
 {¶ 34} "Entrustment theory focuses on situations where one party has conferred power on another party, requiring the entrusted party to exercise discretion over the entrusting party's financial well-being. *** In part, the theory has a historical `pull' encapsulating the classic `trust' paradigm of a party `placing' property under the control of another. In addition, it has elements of reliance theories because a party who confers power on another person must depend or rely on the other not to abuse that power. Furthermore, entrustment theory does not seem to suffer the vagueness of reliance theories, and avoids the rigidity of status theories. *Page 17 
 {¶ 35} "Yet entrustment theory still seems incomplete. As with reliance theories, it focuses almost solely on the conduct of the entrusting party. The idea of a `conferral' of power apparently does not require solicitation or acceptance of that power. This in turn raises the possibility that one might be a reluctant fiduciary, a person on whom power is not just conferred but `dumped.' The lack of a volitional component makes the theory incomplete. Given the extraordinary remedies available for breach of a fiduciary duty, the solicitation or acceptance of a fiduciary relationship should be an essential component of liability." Scallen, Promises Broken vs. Promises Betrayed: Metaphor, Analogy, and The New Fiduciary Principle (1993), 1993 U.Ill. L.Rev. 897, 919 (footnotes omitted).
 {¶ 36} Although conceding that no formal fiduciary relationship existed between it and Hai-Penrose, Cleveland Bluffs maintains that an informal relationship of trust and confidence existed between the parties which transformed the relationship into a "quasi-fiduciary" relationship giving rise to Hai-Penrose's duty to disclose the terms of the GSA lease amendment.
 {¶ 37} It is important to understand that the "informal" relationship of trust and confidence is an adjunct of tort law, not contract law. In the ordinary arm's length contractual relationship, the parties are presumed to be on equal footing when they agree to a set of mutual obligations. As the law has developed, however, the courts have sometimes fashioned remedies that go beyond mere damages for breach of contract in instances when "dependence or vulnerability sometimes leads one party to confer power over its well-being to another party, that in such a situation the party unable to `cover' will suffer in a way *Page 18 
uncompensated by ordinary contract damages, and that the breaching party must have accepted this entrustment of power to justify a heightened duty and extracontractual damages." Id. at 945. In such a case, "[ordinary contract damages are inadequate for a promise betrayed both because they do not make the fiduciary account for its abuse of power and because they do not make the vulnerable party whole." Id. See, also, Clark, The Writing on the Wall: The Potential Liability of Mediators As Fiduciaries (2006), 2006 B.Y.U. L.Rev. 1033, 1038-1039 (collecting cases).
 {¶ 38} Applying these principles, we find no evidence in the record to show that Hai-Penrose had any reason to believe that Cleveland Bluffs reposed "a special trust or confidence" in them such that an informal fiduciary relationship developed that obligated Hai-Penrose to inform Cleveland Bluffs about the lease amendment.
 {¶ 39} Kassouf was, by his own description, a sophisticated real estate developer who had the assets and experience to develop the building on his own. Although his reasons for doing so are not clear from the record, he approached Hai-Penrose to explore a development deal. At the time they first met, the parties were strangers. Hai-Penrose made it very clear to Kassouf that "we don't joint venture or partner with anybody. We are independently [sic] principles in our own right."
 {¶ 40} The evidence shows that the parties entered into their contractual relationship solely on the desire to profit from the development and construction of the FBI field office. Their negotiations were typical of the kind of hard bargaining that occurs between sophisticated business people dealing at arm's length — both sides were represented by very *Page 19 
experienced counsel, they were looking out for their own best interests, and it took nearly three months to finalize the terms of the letter of intent. That letter of intent included a provision in which the parties agreed that it contained the exclusive agreement of the parties and superseded any oral or written agreements between them. This evidence leaves no doubt that the parties were each negotiating in their own best interests.
 {¶ 41} When the GSA selected Hai-Penrose to build the building, negotiations commenced on the terms of the ground lease. Again, these were contentious negotiations in which both sides were represented by experienced counsel. At one point, Hai-Penrose sued Kassouf and Cleveland Bluffs to force them to accept the terms of the KeyBank construction loan and execute the ground lease. When the parties finally did agree to the terms of the ground lease, they stated in paragraph 34:
 {¶ 42} "No Partnership. Nothing in this Ground Lease shall be construed as making Lessor and Lessee joint venturers, partners or equity stakeholders, and except in the event of breach by Lessor of its obligations under this Ground Lease, Lessor shall not be responsible to Lessee for any costs, fees, liabilities or other obligations arising out of the GSA Lease."
 {¶ 43} Given the adversarial nature of the ground lease negotiations and the parties' express acknowledgment that they were not partners, we cannot conclude that Kassouf and Cleveland Bluffs reposed a special trust or confidence in Hai-Penrose. At all events, these sophisticated parties bargained in pursuit of their own best interests. Cleveland Bluffs' argument seeks to turn a typical arm's length commercial transaction into one that is afforded a protection that belies the very nature of the relationship. *Page 20 
 {¶ 44} The evidence may even suggest a lack of due diligence by Cleveland Bluffs. An example of this is demonstrated by uncontradicted evidence from the assistant regional counsel for the GSA who submitted an affidavit in which he detailed how the GSA would deal with a proposed change of ownership. Regional counsel stated that while it was not unusual for there to be changes of ownership of properties leased by the GSA, "confusion often arises regarding entitlement to rent from GSA. To eliminate such a possibility, it is not unusual for leases to include a statement that GSA has a right to approve such changes in ownership, and must receive certain information from the assignor, proposed assignee, transferee or successor lessor."[9] Citing to Title 41 U.S. Code, Section 15, [10] regional counsel noted that the GSA had the right to approve all requests for transfers of ownership, and that the lease amendment "did not impose any greater restrictions on transfers of ownership than existing federal law." Regional counsel also stated that regardless of whether the lease had been amended, "GSA would still have required Cleveland Bluffs to submit a Form 527 and *Page 21 
otherwise be approved by the GSA before becoming the successor lessor under the GSA lease." The federal regulations required GSA approval and any potential purchaser of the FBI building would have to undergo an approval process even in the absence of the lease amendment.
 {¶ 45} Moreover, there is no evidence of any kind to establish the mutual knowledge requirement necessary to show an informal fiduciary relationship. At no point does the evidence show, much less permit an inference, that Hai-Penrose knew that Kassouf and Cleveland Bluffs reposed a special trust and confidence in them. Cleveland Bluffs conceded that it was not a party to the GSA lease. Although it is true that the parties agreed that Hai-Penrose would assign the GSA lease to Cleveland Bluffs, Cleveland Bluffs did not negotiate that lease, nor was it a third-party beneficiary of that lease.
 {¶ 46} It is important to note that the parties may have been working together for a common goal in building the FBI building, but there is no question that they were in an adversarial posture in their dealings with each other. Hai-Penrose's decision to file suit against Kassouf and Cleveland Bluffs in order to force them to agree to the terms of the construction loan and ground lease makes this point manifest, as does their contractual acknowledgment within the ground lease that they were not partners.
 {¶ 47} Civ. R. 56(C) states that summary judgment may be rendered if, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. The adversarial nature of the parties' relationship necessarily dispelled any contention that Hai-Penrose had *Page 22 
an informal fiduciary duty to divulge the existence of the lease amendment's requirement that the GSA approve of any subsequent purchaser of the building. We find as a matter of law that Hai-Penrose did not breach any duty and that Cleveland Bluffs failed to establish one of the requisite elements of fraud. We therefore overrule the first assignment of error.[11]
 II {¶ 48} Cleveland Bluffs' second assignment of error relates to the remaining claims of conversion and breach of contract.[12]
 A {¶ 49} "Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." Zacchini v.Scripps-Howard Broadcasting Co. (1976), 47 Ohio St.2d 224, 226. To prove the conversion of property, "the owner must demonstrate (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the *Page 23 
property to its rightful owner." Tabar v. Charlie's Towing Serv.,Inc. (1994), 97 Ohio App.3d 423, 427-428.
 {¶ 50} In March 2003, during the time period in which Kassouf was seeking GSA approval to own the building, Hai-Penrose became concerned that Cleveland Bluffs might consider any excess cash flow held in Cleveland Assets' account to be an asset of the company subject to his ownership when the parties consummated Cleveland Bluffs' acquisition of Cleveland Assets. An attorney for Hai-Penrose stated that the deteriorating business relationship between Hai-Penrose and Cleveland Bluffs caused him to protect his clients' interests by asking KeyBank to modify the construction loan to make payments directly to accounts held in the individual names of Hai and Penrose. This would, in his words, prevent Cleveland Bluffs from "an easy grab by Mr. Kassouf or by his companies." Walt Dep. at 196. KeyBank agreed to modify the construction loan consistent with Hai-Penrose's desire to insulate the cash flow from Cleveland Assets.
 {¶ 51} Cleveland Bluffs alleged that under the terms of the KeyBank construction loan which the parties incorporated into the ground lease, Hai-Penrose were obligated to apply all excess cash flow generated by the lease to the reduction of principal on the KeyBank construction loan. It further alleged that it had the right to be informed of any changes to construction financing documents. Cleveland Bluffs argues that the modification of the construction loan made the balance on the construction loan more than $2.76 million greater than it should have been without the modification. *Page 24 
 {¶ 52} The court did not err by granting summary judgment on the conversion claim because there is nothing in the ground lease that restricted Cleveland Assets' use of the excess cash flow to the point where Cleveland Bluffs had a possessory interest in the cash flow. The ground lease simply recites that "Lessee has secured construction financing *** upon the terms and conditions set forth in the commitment letter *** a copy of which has been attached as Exhibit E hereto." See Ground Lease, paragraph 4. The construction loan commitment letter from KeyBank stated that "[a]ll excess cash flow generated by the Project after operating expenses and interest expense will be required to be applied toward principal reduction; ***." Nothing in the ground lease specifically limited how Hai-Penrose and KeyBank were to dispose of the excess cash flow. That limitation was a matter of contract between Hai-Penrose and KeyBank, and those two entities could modify the terms of the construction loan without violating any terms of the ground lease.
 {¶ 53} The evidence also showed that the modification of the construction loan was consistent with the parties' understanding that all excess cash flow would go to Hai-Penrose. Kassouf testified in deposition that he understood the "deal" as being that in the event of a delay between completion of construction and the loan closing on permanent financing, the GSA rent would go to Cleveland Assets, a company that was owned at the time by Hai-Penrose. The ground lease is written in terms that comport with Kassouf s understanding that Hai-Penrose would receive the excess cash flow. The ground lease merely memorialized the terms of the KeyBank construction loan commitment letter without stating in any way that Cleveland Bluffs had a right to that cash flow prior to closing on permanent financing. *Page 25 
At all events prior to the closing of permanent financing, neither Kassouf nor Cleveland Bluffs had any possessory interest in the excess cash flow, so it failed to establish the elements of conversion.
 B {¶ 54} Cleveland Bluffs maintains that Hai-Penrose breached the ground lease by (1) refusing to provide certain books and records of assets for Cleveland Assets and (2) insisting on payment of rent from the GSA through July 15, 2005, resulting in the GSA's refusal to pay rent to either of the parties for the month of July 2005.
 1 {¶ 55} The precise terms of Cleveland Bluffs' acquisition of Cleveland Assets were set forth in an "instrument of transfer and assignment." That document transferred to Cleveland Bluffs, all interest that Hai-Penrose had in the assets of Cleveland Assets. Cleveland Bluffs' attorney testified that the instrument of transfer and assignment "[was] not a document acquiring assets. It's a document acquiring the stock or equity interest of the entity that owns the asset." When asked what "assets" were owned by Cleveland Assets at the time of the transfer, the attorney replied that, to his knowledge, Cleveland Assets had no assets "[o]ther than the GSA lease[.]" At the time Cleveland Bluffs signed the instrument of transfer and assignment, it merely sought to purchase the GSA lease; consequently, it did not incorporate any provision into the instrument which would encompass any records. As a matter of law, Hai-Penrose had no contractual obligation to turn over any records of Cleveland Assets that were not identified by the parties prior to consummating the transfer. *Page 26 
 2 {¶ 56} The matter of rent proration arose when the transfer of Cleveland Assets did not occur until July 15, 2005, by which time, Hai-Penrose had incurred expenses for the first half of the month. Hai-Penrose spoke with an attorney for Cleveland Bluffs who told them prior to the closing on Cleveland Assets that rent and expenses would be prorated "to the date of closing." Hai-Penrose then told the GSA to prorate part of the rent to them. When Cleveland Bluffs objected, the GSA withheld the rent payment.
 {¶ 57} The instrument of transfer and assignment makes no provision for the proration of rent. Given that Cleveland Bluffs' attorney admittedly told Hai-Penrose that rent would be prorated to the date of closing, there is no evidence that Hai-Penrose breached any express contractual term. The court did not err by granting summary judgment on the breach of contract claims.
Judgment affirmed.
It is ordered that appellees recover of appellants their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 27 
MARY J. BOYLE, J., CONCURS, ANN DYKE, J., CONCURS IN JUDGMENT ONLY
[1] We retain the naming conventions used by the parties during this litigation. Unless otherwise noted, our use of "Hai-Penrose" is meant to collectively include A.J. Hai Sons, Osprey California, LLC, The Penrose Corporation, and Real Assets Management Company.
[2] Kassouf eventually entered a guilty plea to one count of filing a false tax return for tax year 1989.
[3] A "ground lease" is a long-term lease of land, usually in commercial settings, in which the lessee builds and pays for improvements on the land, even though the lessor retains ownership of the land. When the lease expires, all improvements on the land, including any buildings built by the lessee, revert to the lessor.
[4] Cleveland Bluffs named KeyBank as a co-defendant in this case, alleging that it fraudulently failed to disclose certain lease amendments and that during the term of the construction loan, KeyBank made distributions to the members of Cleveland Assets and that those distributions were placed into KeyBank accounts and held as collateral for the construction loan. Key Bank filed a motion for summary judgment, but Cleveland Bluffs dismissed its complaint against KeyBank with prejudice.
[5] A transactional attorney who represented Hai-Penrose during these negotiations testified at deposition that KeyBank's terms relating to an "exit strategy" were of no practical effect to Kassouf. He noted that Cleveland Assets could not transfer its interest to Cleveland Bluffs until after permanent financing had been obtained. By necessary implication, this meant that a construction loan would have been satisfied, thus ending KeyBank's involvement in the matter and its standing to object. When asked why KeyBank would have included the exit strategy language if that were the case, the attorney replied, "for reasons that are not familiar to me, KeyBank did not want to end up with Mr. Kassouf becoming their borrower[.]"
[6] Cleveland Assets agreed to pay $1.14 million per year in ground rent. The GSA agreed to pay rent of approximately $4.92 million per year.
[7] Kassouf's attorney likewise did not share Kassouf's concerns. He testified at deposition that after seeing SLA-2, he reviewed the pertinent regulations for Kassouf and concluded that Cleveland Bluffs did not need government approval to acquire Cleveland Assets.
[8] "Debarment" is defined in Subpart 2.1 of the Federal Acquisitions Register to mean "action taken by a debarring official under 9.406 to exclude a contractor from Government contracting and Government-approved subcontracting for a reasonable, specified period; a contractor that is excluded is `debarred." The GSA apparently dropped the debarment proceedings against Kassouf in August 2003.
[9] Cleveland Bluffs objected to regional counsel's affidavit, claiming that it included legal conclusions that were inadmissible from a fact witness. The court overruled Cleveland Bluffs' objections and admitted the affidavit. Cleveland Bluffs has not separately assigned as error the court's refusal to strike the affidavit, so we consider any alleged error to be waived. Lewallen v. Mentor Lagoons, Inc. (1993),85 Ohio App.3d 91, 97 (failure to assign error to issue constitutes waiver).
[10] Title 41, U.S. Code, Section 15(a) states, "(a) Transfer. No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States."
[11] Because the failure to establish all of the elements of fraud is fatal to the claim, we deem any discussion on the other elements of fraud to be moot. See App. R. 12(A)(1)(c). Likewise, Cleveland Bluffs acknowledges that the civil conspiracy and unjust enrichment claims are based on fraud, so those claims are likewise mooted by the first assignment of error.
[12] Cleveland Bluffs originally included "misappropriation" as part of the conversion claim, but is now limiting its argument solely to conversion. We therefore consider any argument relating to "misappropriation" to be waived on appeal. State v. Williams (1977),51 Ohio St.2d 112, paragraph two of the syllabus. *Page 1